# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

JOY MAJOR HOOP,

                Petitioner,           :    Case No. 1:06-cv-603

     - vs -                           District Judge Susan J. Dlott
                                        Magistrate Judge Michael R. Merz

WANZA JACKSON, Warden,
 Dayton Correctional Institution[1]

                           :

             Respondent.

# REPORT AND RECOMMENDATIONS

This habeas corpus case is before the Court for decision on the merits.  On Petitioner's Second Amended Petition (ECF No. 148), the Warden's Return (ECF No. 150), and Ms. Hoop's Reply (ECF No. 154).

**Procedural History**

Donald "Whitey" Hoop, Petitioner's spouse, was shot to death in the early morning hours of February 10, 1997.  The Twelfth District Court of Appeals described the background facts of the case as follows:

> At approximately 1:30 a.m. on February 10, 1997, Deputy Buddy Moore of the Brown County Sheriff's Office noticed a suspicious looking truck leaving Slammers Bar ("Slammers") in Mt. Orab,

---

[1] This action was commenced while Ms. Hoop was confined at the Ohio Reformatory for Women,  The Attorney General advises she has been transferred to the Dayton Correctional Institution.  Wanza Jackson, Warden of DCI, is hereby substituted as Respondent under Fed. R. Civ. P. 25.

Brown County, Ohio. He observed the truck turn into the driveway of a residence across the street from Slammers.

Moments later, the Brown County 911 dispatcher received a telephone report of a shooting in the Slammers parking lot, and Dep. Moore was dispatched to the scene. When he arrived, Dep. Moore found appellant, the owner of Slammers, kneeling over Donald's body and crying. Dep. Moore called for assistance, returned to the body, and determined that there was no pulse. A search of Slammers revealed no further victims or any suspects.

Trooper Walden of the Ohio State Patrol arrived, and Dep. Moore requested that Tpr. Walden go to the residence where the earlier-observed truck had parked. Tpr. Walden found that the truck was still present at the residence. Tpr. Walden and Dep. Moore knocked on the front door, and Kathy Kerr, the homeowner, answered. When asked if the man who had driven the truck was in the house, Kerr stated that he was in the bathroom.

The officers were led to the bathroom, where Carl G. Lindsey was discovered washing himself. Lindsey's clothes were soaking in bloody water in the bathtub. On the vanity was a pocketknife and a box of ammunition. Dep. Moore arrested Lindsey, and Lindsey's clothes were seized, as was Donald's wallet, which was found in the bathroom garbage can and contained over $ 1,000. The officers also seized the pocketknife and ammunition. A Jennings .22 caliber automatic pistol was found behind the bathroom door.

Appellant was taken to the sheriff's office for questioning. Appellant gave a statement to Lt. Forest Coburn admitting that earlier that evening she, Kerr, Lindsey, and Kenneth Swinford had talked about killing Donald. Appellant maintained that the conversation was only a joke, and that she had not intended for Donald to be harmed.

*State v. Hoop*, 134 Ohio App. 3d 627, 631-32 (12th Dist. Aug. 2, 1999).

On May 29, 1997, Ms. Hoop was indicted by a Brown County grand jury for her alleged participation in the murder and charged in four counts: conspiracy with Carl Lindsey to commit the murder and three different theories of complicity with Lindsey in the murder; each count carrying the same two death penalty specifications. *Id.* at 632. At trial a jury found Ms. Hoop guilty on counts 1, 2, and 3, but not guilty on count 4. Although they also convicted her on the

2

second death penalty specification to the counts of conviction, they found the aggravating circumstances did not outweigh the mitigating circumstances and recommended a sentence of life imprisonment with parole eligibility after twenty-five years, the sentenced imposed by the trial judge.  The counts of conviction were found to be allied offenses of similar import under Ohio Revised Code § 2941.25 and were merged before sentencing.  Before sentencing, Ms. Hoop filed a motion for new trial which was denied.

On appeal the Twelfth District overruled two assignments of error, but remanded for a hearing on the motion for new trial and found the first assignment (insufficient evidence/weight of the evidence) was not ripe until the remand was completed.  *State v. Hoop, supra.*  On remand the motion for new trial was again denied and that judgment was affirmed on appeal.  *State v. Hoop*, 2001 WL 877296 (12th Dist. Aug. 6, 2001).  The Ohio Supreme Court declined to exercise jurisdiction over a further appeal.  *State v. Hoop*, 93 Ohio St. 3d 1484 (2001).

Ms. Hoop filed a petition for post-conviction relief on March 29, 1999, which the trial court denied February 9, 2004.  Ms. Hoop appealed, but the Twelfth District affirmed.  *State v. Hoop,* 2005 WL 694545 (12th Dist. Mar. 28, 2005).  The Ohio Supreme Court again declined to exercise its appellate jurisdiction.  *State v. Hoop,* 106 Ohio St. 3d 1504 (2005).

Ms. Hoop filed her Petition in this Court September 7, 2006 (ECF No. 2).  On order of then-Magistrate Judge Timothy Black, the State filed a Return on November 17, 2006 (ECF No. 8).  The reference of the case was transferred to the undersigned November 15, 2007, as part of the workload balancing among Western Division Magistrate Judges (ECF No. 24).

After the transfer, District Judge Dlott granted Ms. Hoop leave to depose Carl Handorf and the deposition was conducted with the undersigned presiding (ECF Nos. 42, 55).  Carl Lindsey, Ms. Hoop's co-defendant, intervened to attempt to protect his claim of privilege

regarding Mr. Handorf's testimony (ECF No. 58).  Release of the Handorf transcript was delayed until the Sixth Circuit denied Lindsey's mandamus petition.  In re: Carl Lindsey, Case No. 09-3502 (6th Cir. Aug. 3, 2009)(unpublished, copy at ECF No. 75).

Ms. Hoop filed an Amended Petition January 5, 2010 (ECF No. 102).  On June 15, 2010, these proceedings were stayed pending the outcome of additional proceedings in the Brown County Court of Common Pleas (ECF No. 122).  During the stay, Ms. Hoop filed two motions for new trial which were both denied in the trial court and on appeal.  Following final Ohio State Supreme Court denial of exercise of jurisdiction (*State v. Hoop*, 137 Ohio St. 3d 1422 (2013)), this Court dissolved the stay pending exhaustion (ECF No. 143).

In her Second Amended Petition, Ms. Hoop pleads the following grounds for relief:

> FIRST CLAIM FOR RELIEF: The Trial Prosecutor Failed to Provide Defense Counsel With Exculpatory Material Evidence. United States Constitution, Sixth, Eighth and Fourteenth Amendments.
>
>> A. The prosecution suppressed the statement of an eyewitness.
>>
>> B. The prosecution suppressed evidence of Kerr's initial statement.
>>
>> C. The prosecution suppressed evidence of a fleeing vehicle.
>>
>> D. The prosecution suppressed the search of the Swinford Vehicle.
>>
>> E. The prosecution suppressed the Sheriff's Department's communications with all local hospitals.
>>
>> F. The prosecution suppressed evidence concerning Norman Fisher.
>>
>> G. The prosecution suppressed evidence concerning the crime scene.

H.  The prosecution suppressed forensic evidence.

I.  The prosecution suppressed information concerning Carl Lindsey.

J.  The suppressed evidence was material.

SECOND CLAIM FOR RELIEF: The Brown County Sheriff Failed To Preserve Its Investigatory File. United States Constitution, Sixth, Eighth and Fourteenth Amendments.

THIRD CLAIM FOR RELIEF: The Trial Court Failed To Conduct An *In Camera* Interview Of Investigator Handorf. Fifth, Sixth and Fourteenth Amendments. [Withdrawn]

FOURTH CLAIM FOR RELIEF: The State Appellate Court Did Not Order That The Investigator Release The Name Of The Individual Who Provided The Murder Weapon. Fourteenth Amendment.

FIFTH CLAIM FOR RELIEF: Trial Counsel Failed To Provide Her With Reasonable Effective Assistance Of Counsel. Sixth, Eighth, and Fourteenth Amendments.

I.  Trial counsel performed deficiently.

II. Trial Counsel's deficient performance prejudiced Petitioner.

SIXTH CLAIM FOR RELIEF: Petitioner Is Factually Innocent Of The Aggravated Murder Of Donald Hoop. Eighth and Fourteenth Amendments.

SEVENTH CLAIM FOR RELIEF: Petitioner's Convictions and Sentences Are Constitutionally Infirm Because Of The Cumulative Effect Of The Errors That Occurred At Her Trial. Sixth, Eighth, and Fourteenth Amendments.

(ECF No. 148, PageID 4920-50)

# ANALYSIS

**Ground One:  Violations of *Brady v. Maryland***


In her First Claim for Relief, Ms. Hoop asserts prosecutorial misconduct in failure to produce evidence which allegedly should have been produced under *Brady v. Maryland*, 373 U.S. 83 (1963).

Ms Hoop presented this claim to the Twelfth District Court of Appeals on appeal from denial of her motions for new trial.  That court decided the claim as follows:

{¶ 12} Assignment of Error No. 1:

{¶ 13} THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S FIRST CLAIM FOR RELIEF.

{¶ 14} Hoop argues in her first assignment of error that the trial court erred by denying her motion for a new trial because the state suppressed nine pieces of favorable, material, exculpatory evidence.

{¶ 15} The decision to grant or deny a motion for a new trial pursuant to Crim.R. 33 rests within the sound discretion of the trial court. *State v. Schiebel,* 55 Ohio St.3d 71, 76 (1990). An appellate court may not disturb a trial court's decision denying a motion for a new trial absent an abuse of discretion. *State v. Blankenship,* 102 Ohio App.3d 534, 556 (12th Dist.1995). Rather than a mere error of law or judgment, an abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Hancock,* 108 Ohio St.3d 57, 2006–Ohio–160.

{¶ 16} Hoop argues that a new trial is warranted based on nine pieces of newly discovered evidence that the state suppressed before her jury trial. Hoop asserts that the state's suppression constituted a violation of the Fourteenth Amendment based on the United States Supreme Court decision, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963). As stated by the Ohio Supreme Court,
　　　　Suppression by the prosecution of evidence that is favorable to the accused and "material either to guilt or to punishment" is a violation of due process. Evidence suppressed by the prosecution is "material" within the

6

meaning of *Brady* only if there exists a "reasonable probability" that the result of the trial would have been different had the evidence been disclosed to the defense. As the United States Supreme Court has stressed, "the adjective ['reasonable'] is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."(Internal citations omitted.)

*State v. LaMar,* 95 Ohio St.3d 181, 2002–Ohio–2128, ¶ 27, quoting *Kyles v. Whitley,* 514 U.S. 419, 433–434, 115 S.Ct. 1555 (1995).

{¶ 17} During the hearing on Hoop's motion for a new trial, the state conceded that the nine pieces of evidence were not available to the defense at the time of her trial. Therefore, at most times, we will focus our analysis on whether the following pieces of evidence are favorable to Hoop, and whether or not the evidence is material within the meaning of *Brady.*

*4 {¶ 18} First, Hoop argues that the state suppressed statements from Donald Barnett, who police interviewed two days after the murder. Barnett was at his mother's residence across the street from Slammers on the night of the murder, and heard an individual tell another individual "come on, lets go get out of here" [sic]. Hoop claims that this statement demonstrates that a second individual was involved in the commission of the murder. Hoop then suggests that other possible participants "could have been" Kathy Kerr or Kenny Swinford.

{¶ 19} Even if we were to assume that Barnett's statement is somehow favorable to Hoop, we do not agree with her that such evidence is material. The record indicates that Barnett heard the individual say "come on, lets go get out of here" [sic] between 12:30 a.m. and 12:45 a.m. when he was coming from the garage. He further stated that he was awake until around 1:00 a.m. and that, "I didn't see nothing after that." Barnett also did not hear any gunshots or anyone yelling after 1:00 a.m. The record is clear that the shooting occurred at approximately 1:30 a.m., when the Brown County Sherriff's Office dispatcher received a 911 call that a shooting had occurred at Slammers. Therefore, even if Barnett had testified at trial to what he heard, the evidence would have only adduced that almost an hour before the shooting, an individual was heard stating, "come on, lets go get out of here" [sic]. This statement does not in any way establish that a second individual,

7

separate from Hoop, was involved in the commission of the murder, and was not suppressed in violation of *Brady*.

{¶ 20} Hoop next argues that the state suppressed material evidence regarding an initial statement made by Kathy Kerr. On the night of the murder, officers went to Kerr's residence because that is where Deputy Moore saw the suspicious truck park. When Deputy Moore and the trooper arrived at Kerr's home, they asked her who Lindsey was, and Kerr apparently responded that he was her husband, and then changed her statement and told officers that Lindsey was her boyfriend. Hoop now theorizes that Kerr's statement demonstrates that she was protecting Lindsey and that Kerr had no motive to lie about her relationship with Lindsey unless she was somehow involved in the commission of the murder.

{¶ 21} If we first assume that Kerr's statement characterizing her relationship with Lindsey was somehow beneficial to Hoop, we do not find the statement material evidence. The inherent favor to Hoop of Kerr's statement is that Kerr was being either dishonest with police, or that she was being inconsistent in her statements. If Kerr had been presented to the jury as a witness beyond reproach, perhaps this statement would have raised questions in the jurors' minds about Kerr's ability to be consistent. However, Kerr's testimony was riddled with inconsistent statements, and as stated by the trial court, "the jury was well aware of Kathy Kerr's initial lack of forthrightness."We simply cannot say that not having Kerr's statement regarding her relationship with Lindsey denied Hoop a fair trial or that the result of her trial would have been different with its use.

*5 {¶ 22} Hoop next argues that the state suppressed favorable and material evidence that on the night of the murder, Deputy Moore saw a vehicle passing at a high rate of speed coming from the direction of Slammers. After being dispatched to Slammers, Moore traveled to the scene and noticed a speeding automobile coming from the direction of Slammers. Another officer was then instructed to watch for the speeding car. Hoop now argues that the existence of a speeding car contradicts the state's theory that she was one of the two assailants because she never left Slammers. Hoop thereby insinuates that the driver of the speeding car was the true second assailant.

{¶ 23} Although evidence that a second vehicle was seen fleeing the scene of Slammers may have been favorable to Hoop, such evidence was not suppressed by the state. The only evidence

8

deduced from Moore's statement is that a speeding car passed him, coming north on State Route 68. However, no one ever saw the car coming specifically from Slammers, and there was no indication as to where the car was actually coming from or going to. Moreover, Moore appeared at trial as a witness and was cross-examined as to the events in question and his observations before and after being dispatched to Slammers. Moore also testified that he reported his observations regarding the car to dispatch. Therefore, this information was readily available to the defense during discovery. Notwithstanding the availability of the evidence, we do not find the evidence material.

{¶ 24} Hoop next argues that the state suppressed three pieces of favorable and material evidence concerning steps police officers took to investigate the murder. Specifically, Hoop argues that the Ohio Bureau of Criminal Investigation processed Kenny Swinford's vehicle, communicated with local hospitals about the possibility of an injured fleeing suspect, and that officers directed the dispatcher to collect information on Norman Fisher who had left Slammers around the time of the shooting. Essentially, Hoop argues that these investigatory measures demonstrate that the police believed someone else was involved in the murder.

{¶ 25} While evidence that Hoop was not the initial suspect may, at first blush, seem favorable to her, evidence that police employed several techniques during their investigation of the murder is not material. The police are charged with the duty to investigate crimes, and as such, must explore several avenues when determining facts and circumstances and identifying possible suspects. During the investigation, officers searched Swinford's vehicle, asked local hospitals to report any suspicious injuries, and also gathered information on a patron who was present at Slammers around the time of the shooting. The steps taken during the investigation are not favorable or material to Hoop's defense because they actually tend to prove that the police narrowed the list of suspects to only Lindsey and Hoop after they had first investigated other people and came to the conclusion that none were involved in the murder. The jury heard testimony from the police officers who were subjected to cross-examination regarding their observations, actions, and techniques employed during the murder investigation. Testimony that police searched but found nothing incriminating in Swinford's vehicle, that no one sought medical attention for suspicious injuries, or that other Slammers' patrons were ruled out as suspects would not have changed the jury's verdict.

9

{¶ 26} Hoop next argues that the state suppressed favorable and material evidence regarding the crime scene. During the federal discovery process, Hoop received information that a detective testified before the grand jury that the crime scene indicated that Lindsey and Donald Hoop had been involved in a physical altercation before the shooting occurred. Therefore, Hoop argues that the detective's testimony establishes that Donald's murder was committed during the course of a robbery, rather than a planned or premeditated murder for hire. Hoop asserts that this evidence is inconsistent with the state's theory of the case.

{¶ 27} Even if we were to assume that this evidence is favorable to Hoop, we cannot say that it is material. The indictment charging Hoop included specifications as to not only murder for hire, but also aggravated murder during the commission of a robbery. The state itself, therefore, asserted the theory that a robbery had occurred or was being commissioned when Donald Hoop was murdered. Furthermore, during the state's opening statement, the prosecutor stated, "I think the evidence will show when [Donald] was shot * * * the first time [sic] but there must have been a struggling [sic] because of the blood all around the area. And then finally another contact shot, contact meaning about a half inch or less to the position where he was shot in the forehead." Therefore, the jury was well aware that a possible struggle may have ensued before Donald died. Moreover, defense counsel was permitted to inquire into this robbery theory, and was able to cross-examine on the subject. Evidence of the specific testimony elicited before the grand jury, however, would not have produced a different result at Hoop's trial. Nor can we say that the absence of such testimony deprived Hoop of a fair trial in any way.

{¶ 28} Hoop argues that the prosecution suppressed favorable and material forensic evidence. The latent print examiner did not find any fingerprints on the murder weapon, but did find a fingerprint on one of the bills recovered from Kerr's residence that had been stolen from Donald Hoop. The print did not belong to Hoop.

{¶ 29} The fact that Hoop's fingerprints were not the same as those located on the money is neither favorable to Hoop, nor material. The state proceeded under the theory that Hoop commissioned and participated in the planning of her husband's murder. The state, however, did not assert that Hoop *actually* stole the money from Donald Hoop's wallet. The evidence overwhelmingly demonstrated that Lindsey *actually* shot Donald and stole the wallet that contained the money in question. The fact that Hoop's fingerprints were not recovered from the money does not prove that she did not

10

have an involvement in the planning of the murder, as was charged by the state and found by the jury.

{¶ 30} Hoop argues that the prosecution suppressed favorable and material evidence regarding the fact that Carl Lindsey had been the subject of an active investigation by the Brown County Sheriff's Office regarding a recent string of burglaries in the area. Hoop asserts that this evidence is material because it demonstrates that Donald's murder was the product of a theft offense rather than a planned murder for hire.

{¶ 31} Even if we were to assume that this evidence is favorable to Hoop, we cannot say that it is material. First, Lindsey was merely a suspect in the burglary investigation, and no charges had been brought against him. Even if charges had been brought or convictions obtained, the fact that Lindsey had broken into people's homes is not the same as carrying out a robbery in the parking lot of a bar and shooting the victim after planning such events during the preceding evening. Besides the obvious evidentiary issues associated with trying to prove conduct in conformance with past activities, this evidence would not have changed the outcome of the case.

{¶ 32} The nine pieces of evidence asserted by Hoop as being both favorable and material do not rise to the level of *Brady* violations. The absence of this evidence, both individually and collectively, did not deprive Hoop of a fair trial, and we cannot say that the result of her trial would have been different had the evidence been produced before trial. Having found no violation, Hoop's first assignment of error is overruled.

*State v. Hoop*, 2012-Ohio-992, 2012 WL 777332 (12th Dist. Mar, 12, 2012).

In the Return of Writ, the Warden notes that *Brady* is clearly established Supreme Court precedent, but argues the Twelfth District's application of *Brady* is neither contrary to nor an objectively unreasonable application of that precedent (Return, ECF No. 150, PageID 4960-76.) As a general matter, when a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*,

562 U.S. 86, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).  A state court decision can also be overturned in habeas if it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2).

**Subclaim One**

As to the unproduced statement of Donald Barnett, Ms. Hoop argues the state appellate court's decision that the statement was not *Brady* material "was based on an unreasonable determination of the facts."  (Traverse, ECf No. 154, PageID 5080.)  She claims that Detective Forest Coburn found the statement, taken two days after the crime, to be credible and the appellate court's error consists in rejecting the credibility of the statement, given Coburn's assessment of it.

But the Twelfth District did not find Barnett's statement incredible.  Instead, it found the statement immaterial.   Barnett's statement was that he heard[2] one individual say to another individual about forty-five minutes to an hour before the shooting occurred "come on, let's go get out of here."   The Twelfth District held that Barnett never heard any shooting or indeed anyone yelling after 1:00 A.M.  Ms. Hoop's speculation that this somehow proved that an hour later some additional person was involved in the shooting is just that – pure speculation.  Hoop points to no evidence that Barnett heard or saw anything other than what the Twelfth District found he heard.  Therefore, the Twelfth District's decision that his statement was not material is not based on an unreasonable determination of the facts.

---

[2] Barnett expressly disclaimed having seen anything.

**Subclaim Two**

Kathy Kerr testified at trial that she had heard Hoop talking in the Salmmers bar the night of the murder about killing Donald Hoop. She also testified Petitioner gave Carl Lindsey the murder weapon just before the killing. *State v. Hoop*, 2012-Ohio-992, ¶ 7, 2012 WL 777332 (12th Dist. Mar, 12, 2012).

On the night of the murder, officers went to Kerr's residence because Deputy Moore had seen a suspicious truck park there. When the officers interviewed Kerr, she said Carl Lindsey was her husband and then changed her statement to say he was her boyfriend. Hoop theorized in the state courts that this showed (1) inconsistent statements (Is he husband or boyfriend?), (2) that Kerr was lying from the first moment she was approached by law enforcement, and (3) Kerr would have had no motive to lie unless she was also involved in committing the murder, instead of Hoop.

The Twelfth District found the initial Kerr statement was not material because Kerr's trial testimony itself was "riddled with inconsistent statements" and thus the jury was "well aware of Kathy Kerr's initial lack of forthrightness." *Id.* at ¶ 21. Hoop argues this conclusion is wrong because the "jury did not hear any evidence that Kerr lied to protect Lindsey." (Traverse, ECF No. 154, PageID 5081). But on the same page Hoop argues this was the only evidence the jury would have heard about Kerry having an ongoing relationship with Lindsey and "[i]f Kerry and Lindsey had not been involved together in the commission of the murder, she would not have had a motive to lie to protect him." *Id.* It certainly is not unknown in the annals of crime that a man or woman will lie to protect a spouse from a charge of serious crime, even if they are not involved in committing the crime. And if the supposed lie is that Lindsey was either husband or

boyfriend and he was not, what does that do to the ongoing relationship theory. Given the other inconsistencies in her testimony, the Twelfth District's conclusion that this one statement was not material impeachment is not an objectively unreasonable application of *Brady*.


**Third Subclaim**


The third piece of supposed *Brady* material was that Deputy Moore, having been dispatched to Slammers on the report of shots fired, passed a speeding vehicle going in the opposite direction. As the Twelfth District pointed out, nothing was suppressed: Moore testified at trial about the vehicle speeding in the opposite direction and was cross-examined about it. There was no testimony at trial or since that anyone had seen the car coming from Slammers. Moore's observations about the car were reported to dispatch and therefore would have been available to the defense in discovery.

In her Traverse, Ms. Hoop asserts Trooper "Moore did not testify he saw a vehicle speeding from the scene. . ." (ECF No. 154, PageID 5082.) This is directly contrary to Ms. Hoop's assertion at ¶ 73 of her Second Amended Petition that "Deputy Moore, when traveling to the scene passed a speeding automobile coming from the direction of Slammers." (ECF No. 148, PageID 4923). Moore also saw the slow moving truck that drove from Slammers to the Kerr residence, leading him to send Trooper Walden there to investigate and find Carl Lindsey.

The Twelfth District's conclusion that Moore's observation of a speeding vehicle heading north on State Route 68 was not suppressed *Brady* material is not an objectively unreasonable application of *Brady*.

**Fourth Subclaim**

Ms. Hoop argues that the prosecution suppressed a report of the search of Kenny Swinford's vehicle. (ECF No. 148, PageID 4923-24; ECF No.154, PageID 5083-84). Specifically, Ms. Hoop's position is that because the investigators searched Mr. Swinford's vehicle after Carl Lindsey has been convicted, they must have considered him a suspect and that if the jury had known that at one time he was considered a suspect, the jury would have found him less credible. PageID 4924. Ms. Hoop relies on Investigator Fetter's October, 1997, report to establish that investigators processed Mr. Swinford's car in October, 1997. (ECF No. 95, Attachment 1 thereto, PageID 3749). The October, 1997, report regarding the forensic processing of Mr. Swinford's car shows that the agents who processed the car found no evidence connected to the murder of Donald Hoop. *Id.*

Mr. Swinford testified at Ms. Hoops' trial that he was present at Slammers on February 10-11, 1997, that he heard Ms. Hoop discussing with a man and a woman at the bar the subject of killing Donald Hoop, that Ms. Hoop asked him (Mr. Swinford) to help, and that he said no. (ECF No. 8, Attachment 40 thereto, PageID 469-535). Mr. Swinford also testified that that when investigators first questioned him about Donald Hoop's murder, he did not want to be a witness and told the police that he was "pretty drunk" [at the time of the events that led to the killing] and that he didn't know anything. *Id.,* PageID 477; 479.

On cross-examination, Mr. Swinford testified that he was, in fact, highly intoxicated on the night of February 10-11, 1997, and that when he left Slammers, he had an automobile wreck about four miles from Slammers. *Id.,* PageID 480-81. Mr. Swinford also testified that at the time of the conversation he heard about killing Donald Hoop, he thought that Joy Hoop, Carl Lindsey,

and Kathy Kerr were "talking just silly stuff", "a bunch of stupid bull shit", and that he participated in the conversation by telling them they "were crazy for thinking they could do anything like that." *Id.* PageID 481-82. Mr. Swinford testified further that he told the group that what they really need to do is have the hole already dug before you kill somebody, that they didn't want to kill someone and then go dig the hole, that the ground was frozen and it would be tough to dig a hole that night and that he was not going to stay outside as cold as it was and dig a hole. (ECF No. 8, Attachment 41 thereto, PageID 1388). Mr. Swinford also testified that he had a gun, which he did not, and nobody in the group asked him for it. *Id.,* PageID 1391.

Mr. Swinford testified that although he initially thought that the conversation was just silly stuff, he began to take it a little more seriously before he left Slammers, and that he told the group that he did not want any part of killing Donald Hoop. *Id.,* PageID 1397.

While Mr. Swinford's testimony can be construed to benefit the prosecution, it also put him at Slammers at the time of the conversation among Ms. Hoop, Ms. Kerr and Mr. Lindsey, and participating in that conversation. In addition, Mr. Swinford admitted that he participated in the conversation, advised the group about disposing of a dead body, and falsely claimed that he had a gun. That testimony certainly clouded Mr. Swinford's credibility. The fact that investigators processed his vehicle would not have added to that cloud.

More importantly, the fact that police searched Mr. Swinford's vehicle and found nothing incriminating simply rules out Mr. Swinford as a suspect. If the jury had heard evidence that Mr. Swinford had been *ruled out* as a suspect in Donald Hoop's murder, the jury's verdict would not have changed. It is difficult to see how a report that exonerated Swinford (or at least found no evidence in his car, tending thereby to exonerate him) would have assisted in his impeachment.

16

Under these circumstances, not having report of the October, 1997, search of Mr. Swinford's vehicle did not deprive Ms. Hoop of a fair trial nor would the result of her trial been different. The state court's decision as to Ms. Hoop's *Brady* claim contained in subclaim four of her First Claim for Relief is not contrary to or an unreasonable application of clearly established federal law.

**Fifth Subclaim**

In her fifth sublcaim, Ms. Hoop asserts that the prosecution wrongly suppressed the sheriff department's communications with all local hospitals. (ECF No. 148, PageID 4924-25; ECF No. 154, PageID 5084-85). Ms. Hoop's position is that after Mr. Lindsey was in custody and she was in the back seat of a police vehicle, the sheriff directed the dispatcher to contact all the local hospitals and inform hospital personnel they were to contact the sheriff if any person appeared at the hospital seeking treatment for severe injuries sustained on the previous night of February 10, 1997, or in the early morning hours of February 11, 1997. *Id.*, PageID 4925. As in her fourth subclaim, Ms. Hoop argues that the sheriff's actions establish that the police suspected that another individual, other than herself, was involved in Donald Hoop's murder.

Similar to Ms. Hoop's fourth subclaim, the fact that the police *ruled out* other potential suspects does nothing for Ms. Hoop's claim. That is, while in the very early stages of the investigation the police sought to locate any other possible participants and did not find any would not have affected the outcome of Ms. Hoop's trial. Therefore, not having evidence that in the early stages of the investigation the sheriff contacted local hospitals did not deprive Ms. Hoop of a fair trial nor would the result of her trial been different. The state court's decision as to

17

Ms. Hoop's *Brady* claim contained in subclaim E of her First Claim for Relief is not contrary to or an unreasonable application of clearly established federal law and it should be rejected.

**Sixth Subclaim**

In her Sixth Subclaim, Ms. Hoop asserts that the prosecution suppressed favorable evidence concerning Norman Fisher. (ECF No. 148, PageID 2925-26; ECF No. 154, PageID 5085.) Ms. Hoop argues that after the authorities arrested Carl Lindsey, Detective Fetters directed the dispatcher to collect information on Norman Fisher who had left Slammers at about the time of the shooting. (ECF No. 148, PageID 4925, [citing ECF No. 146, Attachment 1 thereto, PageID 4441]. Ms. Hoop's position is that this shows that the Sheriff's Department possessed information that a second individual, and not Ms. Hoop, was involved in the homicide. (ECF No. 148, PageID 4925.)

Respondent argues that this claim is procedurally defaulted because Ms. Hoop failed to raise it on direct appeal. (ECF No. 150, PageID 4970.) Respondent argues in the alternative that Ms. Hoop does not cite what newly discovered evidence formed the basis for a *Brady* claim, that there is no evidence that the police considered Mr. Fisher a suspect, and that there is no evidence that the prosecution suppressed evidence of that allegation. *Id.* at PageID 4970-71. Finally, Respondent argues that Ms. Hoop's statement to the police makes it clear that she knew that Mr. Fisher, among others, was present at the time of the killing and therefore she knew that he might have information about the events leading to and culminating to Donald Hoop's murder. *Id.* at PageID 4971.

Ms. Hoop concedes that "the state appellate court did not directly address this issue."

(ECF No. 154, PageID 5085). However, she argues that the state court "claimed that this information in conjunction with similar information supported the conclusion that the police conducted a thorough investigation prior to narrowing the suspects to [Carl] Lindsey and Ms. Hoop." *Id.*

At this juncture, it is helpful to review the history of Ms. Hoop's July 8, 2010, Motion for a New Trial.  In her First Claim for Relief in that Motion, Ms. Hoop raised several *Brady* subclaims, including this one.  (ECF No. 146, Attachment 1 thereto, PageID 4386-87. The language in that subclaim F, in fact, is strikingly similar to the language Ms. Hoop used in her sixth subclaim here. Compare, *Id.,* with ECF No. 148, PageID 4925-26 and ECF No. 154, PageID 5085. This Court concludes that Ms. Hoop clearly raised that claim in her Motion for a New Trial and it is not therefore procedurally defaulted

> In its entry denying Ms. Hoop's Motion, the trial court addressed her subclaim F noting:
>
> > As to the alleged suppression of evidence concerning Norman Fisher, it would be appropriate for the sheriff's department to have collected information on persons who were present at Slammer's [sic] Bar at or about the time of the shooting. It is further once again noted that the various law enforcement officers and private individuals who testified at the Defendant Hoop's trial were subjected to cross-examination as to what they saw, what they did, what they observed, and what action they took. This would apply to law enforcement officers as well as the private individuals who were present at Slammer's [sic] Bar.

(ECF No. 146, Attachment 1 thereto, PageID 4573.

In her first claim in her merit brief on appeal, Ms. Hoop raised her *Brady* claims and she again raised in subclaim F her claim related to Norman Fisher. *Id.*, PageID 4596.  As noted above, the court of appeals affirmed the trial court. *Hoop,* 2012 WL 777332; see also ECF No. 146, Attachment 1 thereto, PageID 4634-35.

Finally, in her Memorandum in Support of Jurisdiction in the Ohio Supreme Court, Ms. Hoop again raised her *Brady* claims including subclaim F in which she alleged that the prosecution suppressed favorable evidence concerning Norman Fisher. (ECF No. 146, Attachment 1 thereto, PageID 4657. As noted above, the Ohio Supreme Court denied Ms. Hoop leave to appeal and dismissed her appeal as not involving any substantial constitutional question. *Hoop*, 132 Ohio St.3d at 1482; ECF No. 146, Attachment 1 thereto, PageID 4699.

In its decision affirming the trial court, the Twelfth District wrote:

> While evidence that Hoop was not the initial suspect may, at first blush, seem favorable to her, evidence that police employed several techniques during their investigation of the murder is not material. The police are charged with the duty to investigate crimes, and as such, must explore several avenues when determining facts and circumstances and identifying possible suspects. During the investigation, officers searched Swinford's vehicle, asked local hospitals to report any suspicious injuries, *and also gathered information on the patron who was present at Slammers around the time of the shooting.* The steps taken during the investigation are not favorable to material to Hoop's defense because they actually tend to prove that the police narrowed the list of suspects to only Lindsey and Hoop after they had first investigated other people and came to the conclusion that none were involved in the murder. The jury heard testimony from the police officers who were subjected to cross-examination regarding their observations, actions, and techniques employed during the murder investigation. Testimony that police searched but found nothing incriminating in Swinford's vehicle, that no one sought medical attention for suspicious injuries, of that other Slammers' patrons were ruled out as suspects would not have changed the jury's verdict.

*Hoop,* 2012 WL 777332 at *5; see also ECF No. 146, Attachment 1 thereto, PageID 4634-35 (emphasis supplied).

First, it is clear that Ms. Hoop has raised her *Brady* claim with respect to Norman Fisher at every stage of the relevant state court proceedings and that the state courts addressed that

claim. While the state court of appeals did not mention Norman Fisher by name, in light of Ms. Hoops' claim that, "Detective Fetters directed the dispatcher to collect information on Norman Fisher who had left Slammers at about the time of the shooting", ECF No. 148, PageID 4925; ECF No. 154, PageID 5085, the court of appeals' reference to "the patron who was present at Slammers around the time of the shooting" is a clear reference to Norman Fisher.

At Ms. Hoop's trial, Forest Coburn testified that at the time of the killing of Donald Hoop, he was a detective employed by the Brown County Sheriff's Department. ECF No. 8, Attachment 48 thereto, PageID 1973. Detective Coburn testified further that while investigating the incident at Slammers Bar, on February 10 [1997], he took a statement from Ms. Hoop and she never tried to hide who was present in the bar with her the night of the incident. See, *e.g.,* ECF No. 8, Attachment 50 thereto, PageID 246-47; PageID 248. Detective Coburn testified further that he again interviewed Ms. Hoop on May 16, 1997, at which time Ms. Hoop, again told him that Kathy Kerr, Carl Lindsey, Norman Fisher, A.J. [Cox] [ECF No. 8, Attachment 35 thereto, PageID 1008], Gail [Kneipp] [*Id.*, PageID 1011], and Kenny Swinford were in Slammers with her the night Donald Hoop was killed. *Id.,* PageID 250-51.

First, Ms. Hoop has never denied knowing that Norman Fisher was in Slammers with her the night that Donald Hoop was murdered. Nor has she ever suggested that Norman Fisher was not available to her or her counsel for questioning about his knowledge of the events surrounding Donald Hoop's death. What Ms. Hoop does contend is that the state violated her rights under *Brady* by failing to tell her that the police "collect[ed] information" about him after she and Mr. Lindsey were in custody.

Ms. Hoop has not cited, nor has this Court found, any federal law which even suggests that it is not proper procedure for the police to make investigative inquiries about all potential

witnesses to a crime. More importantly, however, Ms. Hoop admits that she knew that Mr. Fisher was at Slammers about the time Donald Hoop was killed and she has not alleged that Mr. Fisher was unavailable to her for questioning. Based on Supreme Court precedent, the Sixth Circuit has long held that where the factual basis for a claim is reasonably available to the petitioner or her counsel from another source, in this case, Mr. Fisher himself, the government is under no duty to supply that information to the defense. See *Matthews v. Ishee,* 486 F.3d 883, 891 (6th Cir.), *cert. denied,* 552 U.S. 1023 (2007), citing *Strickler v. Greene,* 527 U.S. 263, 283 n.24 (1999).

The Twelfth District's decision as to Ms. Hoop's *Brady* claim related to Mr. Fisher is not contrary to or an unreasonable application of clearly established federal law.

**Seventh Subclaim**

In her seventh subclaim, Ms. Hoop alleges that the prosecution suppressed favorable evidence concerning the crime scene. (ECF No. 148; PageID 4926-27; ECF No. 154, PageID 5086. Ms. Hoop's position is that Detective Coburn testified before the grand jury that the state of the crime scene made it appear as if there has been a struggle between Carl Lindsey and Donald Hoop indicating that the motive for the killing was robbery. Ms. Hoop argues that this testimony was inconsistent with the prosecution's theory of the case of premeditated murder based on the fact that she had given a gun to Mr. Lindsey who then laid in wait in the parking lot to shoot Donald Hoop.

While Ms. Hoop bases her argument on Detective Coburn's grand jury testimony, what Ms. Hoop has failed to acknowledge is that Detective Coburn testified at length at her trial and was subjected to cross-examination and re-cross examination by her counsel. (ECF No. 8,

Attachments 48, 49, 50, 51 thereto. Similarly, Ms. Hoop has not alleged that Detective Coburn was unavailable to her for questioning. Therefore, as with her subclaim six, the information which Ms. Hoop alleges the prosecution failed to provide to her was in reality available to her from another source. See *Matthews,* 486 F.3d at 891; *Strickler,* 527 U.S. at 283.

Furthermore, this Court agrees with the state court's conclusion that the evidence is not *Brady* material. The indictment which the Brown County Grand Jury handed down with respect to Ms. Hoop included specifications not only as to murder for hire, but also for aggravated murder during the commission of a robbery. (ECF No. 8, Attachment 3 thereto, PageID 972-974). Therefore, Detective Coburn's grand jury testimony was, in fact, consistent with the indictment and therefore with the prosecution's theory of the case and the introduction of his grand jury testimony at Ms. Hoop's trial would not have caused a different result. Ms. Hoop's seventh subclaim is without merit.

**Eighth Subclaim**

In her eighth subclaim, Ms. Hoop asserts that the prosecution suppressed favorable forensic evidence that her fingerprints were not found on the murder weapon (ECF No. 148, PageID 4926-27). Her position is that the latent print examiner did not find any fingerprints on the murder weapon but on July 21, 1997, he found a fingerprint on one of the bills (currency) that Carl Lindsey stole from Donald Hoop and which was recovered at Kathy Kerr's residence. *Id.* Ms. Hoop's position is that the print examiner did not find her prints on the money and that this neutral or inconclusive report could constitute favorable evidence even though the documents did not eliminate her as a defendant. *Id.* Although she failed to raise the claim in her

Second Amended Petition for Writ of Habeas Corpus, in her Traverse, Ms. Hoop argues that the state court failed to address the report concerning the murder weapon which was the more critical of the two items. PageID 5087.

This Court will first address Ms. Hoop's argument that the state court erred by failing to consider the fingerprint report concerning the murder weapon. To do that, the Court finds that it would be beneficial to review the history of any claim Ms. Hoop has made with respect to the lack of fingerprints on the murder weapon issue.

As noted above, in her First Claim for Relief in her July, 2010, Motion for a New Trial, Ms. Hoop raised several *Brady* subclaims. In her subclaim H, Ms. Hoop argued,

> The latent print examiner did not find any fingerprints on the murder weapon. [Exhibit 9, pp. 461-62]. However, on July 21, 1997, he found a fingerprint on one of the bills (currency) that Lindsey stole from Whitey Hoop at the time of his death and was recovered at Kathy Kerr's residence. The examiner did not find Ms. Hop's prints on the money. [Exhibit 9, pp. 465-66]. Neutral or inconclusive laboratory reports can constitute favorable evidence even though the documents do no eliminate the defendant as a suspect. *Simmons v. Beard* (3rd Cir. 2009), 590 F.3d 223, 237-38.

ECF No. 146, Attachment 1 thereto, PageID 4388-89.

In denying her Motion for a New Trial, the court rejected that subclaim as follows: "As to the alleged prosecution suppression of forensic evidence, the lack of any latent fingerprints of Ms. Hoop on the money recovered at Kathy Kerr's residence is not favorable evidence rising to the level of a *Brady* violation." *Id.*, PageID 4574.

In her appeal to the Court of Appeals for Brown County, Ohio, Ms. Hoop again raised the fingerprint claim:

> The latent print examiner did not find any fingerprints on the murder weapon. [T.d. 4, Exhibit 9, pp. 461-62]. However, on July 21, 1997, he found a fingerprint on one of the bills (currency) that

> Lindsey stole from Whitey Hoop and was recovered at Kathy
> Kerr's residence. The examiner did not find Appellant's prints on
> the money. [Exhibit 9, pp. 465-66]. The prosecution's suppression
> of forensic evidence can serve as a basis for a *Brady* violation.
> *Sawyer v. Hofbauer,* (6th Cir. 2000), 299 F.3d 605, 611-612.
> Neutral of inconclusive laboratory reports can constitute favorable
> evidence even though the documents do not eliminate the
> defendant as a suspect. *Simmons v. Beard* (3rd Cir. 2009), 509 F.3d
> 223, 237-238.

ECF No. 146, Attachment 1 thereto, PageID 4597.

The Court of Appeals affirmed the trial court and with respect to the subclaim which

addressed the fingerprint issue, the court of appeals noted:

> Hoop argues that the prosecution suppressed favorable and
> material forensic evidence. The latent print examiner did not find
> any fingerprints on the murder weapon, but did find a fingerprint
> on one of the bills recovered from Kerr's residence that had been
> stolen from Donald Hoop. The print did not belong to Hoop.
>
> The fact that Hoop's fingerprints were not the same as those
> located on the money is neither favorable to Hoop, nor material.
> The state proceeded under the theory that Hoop commissioned and
> participated in the planning of her husband's murder. The state,
> however, did not assert that Hoop *actually* stole the money from
> Donald Hoop's wallet. The evidence overwhelmingly
> demonstrated that Lindsey *actually* shot Donald and stole the
> walled that contained the money in question. The fact that Hoop's
> fingerprints were not recovered from the money does not prove
> that she did not have an involvement in the planning of the murder,
> as was charged by the state and found by the jury.

*Hoop*, 2012 WL 777332 at *6; see also ECF No. 146, Attachment 1 thereto, PageID 4636-37.

In her Memorandum in Support of Jurisdiction in the Ohio Supreme Court, Ms. Hoop

again raised her *Brady* fingerprint claim as follows:

> The latent print examiner did not find any found [sic] fingerprints
> on the murder weapon. [New Trial Motion, Exhibit 0, pp. 461-62).
> However, he found a fingerprint on one of the bills (currency) that
> Lindsey stole from the victim. That print did not match Appellant's

> prints. [New Trial Motion, Exhibit 9, pp. 465-66]. The prosecution suppressed the reports of fingerprint analysis. Neutral or inconclusive laboratory reports can constitute favorable evidence even though the documents do not eliminate the defendant as a suspect. *Simmons v. Beard,* 590 F.3d 223, 237-238 (3rd Cir. 2009).

ECF No. 146, Attachment 1 thereto, PageID 4657. As noted, the Ohio Supreme Court denied Ms. Hoop leave to appeal and dismissed her appeal as not involving any substantial constitutional question. *Hoop,* 132 Ohio St.3d at 1482; ECF No. 146, Attachment 1 thereto, PageID 4699.

This review of the state court proceedings reveals that at no time did Ms. Hoop raise as a discrete or separate issue the claim that the prosecution did not provide her with the fingerprint findings regarding the murder weapon. Rather, throughout the state court proceedings related to her motion for a new trial, as well as in her Second Amended Petition in this Court, Ms. Hoop used the report of a lack of fingerprints on the murder weapon simply as a comparison to the finding of a fingerprint on one of the bills that Mr. Lindsey stole from Donald Hoop. It is clear that the state court of appeals also interpreted Ms. Hoop's reference to the lack of fingerprints on the murder weapon as simply a vehicle for comparison with the positive fingerprint finding on the currency. A petitioner may procedurally default a claim by failing to raise a claim in state court and pursue that claim through the state's "ordinary appellate review procedures." *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006)(citation omitted). Accordingly, to the extent that Ms. Hoop has raised a claim that the state court erred with respect to her *Brady* claim involving the murder weapon fingerprint evidence, that claim is procedurally defaulted.

The Court now turns to Ms. Hoop's claim that the prosecution violated *Brady* when it failed to provide her with the report that the latent fingerprint expert found Mr. Lindsey's fingerprint on the currency which was stolen from Donald Hoop and which was found in Kathy

Kerr's home but that the expert did not find any of Ms. Hoop's prints on the currency.

As noted above, the evidence at trial established that Mr. Swinford, Ms. Kerr, Mr. Lindsey, Mr. Fisher, Mr. Cox, Ms. Kneipp, and Mr. Swinford were in Slammers with Ms. Hoop on the evening Donald Hoop was killed. See ECF No. 8, Attachment 40 thereto, PageID 469-535; *Id.,* Attachment 41 thereto, PageID 1397; *Id.*, Attachment 50 thereto, PageID 246-51. At no time was Donald Hoop in Slammers on the evening prior to his killing. Stated differently, Ms. Hoop and Donald Hoop did not have any contact prior to Donald Hoop's murder.

The state's theory of the case was that Ms. Hoop participated with Mr. Lindsey in the planning of Donald Hoop's murder and that she hired Mr. Lindsey to commit the murder. The state never theorized that Ms. Hoop actually pulled the trigger or stole the money from Donald Hoop's wallet. As noted above, the evidence introduced at trial established that Donald Hoop was not present at Slammers during the time before he was killed and that Ms. Hoop and Donald Hoop had no contact with each other at Slammers during the time before Donald Hoop was killed. Therefore, the fact that Ms. Hoop's fingerprints were not found on the money that was taken from Donald Hoop's wallet was of no exculpatory value to Ms. Hoop. The fact that Ms. Hoop did not have the latent fingerprint expert's report did not deprive her of a fair trial because there is not a reasonable probability that the jury would have reached a different conclusion if that evidence had been introduced at trial. The state court's decision as to Ms. Hoop's *Brady* claim regarding forensic evidence about fingerprints on the murder weapon is without merit.

**Ninth Subclaim**

In her ninth *Brady* subclaim, Ms. Hoop alleges that the prosecution suppressed

information concerning Carl Lindsey which was favorable to her. ECF No. 148, PageID 4927. Specifically, Ms. Hoop argues that the prosecution suppressed evidence concerning the fact that Mr. Lindsey had been the subject of an active investigation by the Brown County Sheriff's Office regarding a string of burglaries in the area. *Id.*; ECF No. 154, PageID 5087-88. Ms. Hoop's position is that the evidence contradicted the prosecution's theory that Mr. Lindsey would not have killed Donald Hoop if Ms. Hoop had not recruited him for the task and would have shown that Mr. Lindsey was capable of planning and committing the offense without any encouragement. ECF No. 148, PageID 4927; ECF No. 154, PageID 5087.

As noted above, Brown County Sheriff's Detective Forest Coburn testified at Ms. Hoop's trial on cross-examination as follows:

> CROSS EXAMINATION BY MR. CROSWELL:
>
> Q. Det. Coburn, you've investigated this case, correct?
>
> A. Yes, sir.
>
> Q. I suppose you know as much about it as anybody, don't you?
>
> A. I probably know as much as anybody else that's been involved in it, yes, sir.
>
> Q. Would you agree with me it's important when you investigate a case to investigate both sides of the case?
>
> A. Oh, yeah.
>
> Q. In other words to look at everything and make sure you have the whole picture, the total picture?
>
> A. We try, yes, sir.
>
> Q. Now it's been said of you indicated before that the night this incident occurred you formed an opinion that Carl Lindsey had shot and killed Whitey Hoop?
>
> A. Yes, sir.

Q. And that that was your opinion, correct?

A. Yes, sir.

Q. And I presume you had an opportunity to do an investigation to substantiate that that's what had occurred?

A. Yes, sir.

Q. Now in the course of that investigation you had an opportunity to learn that Carl Lindsey had an extensive criminal record, didn't you?

A. Yes, sir.

Q. You had an opportunity to learn that he had been convicted through 1986 to 1990 for seven or eight DUI's, isn't that correct?

A. I do know he had an extensive record. I don't have a total recall.

Q. Do you recall that he had been convicted in 1986 of breaking and entering in Brown County, Ohio?

A. I know there was a B&E, yes, sir.

Q. And do you recall that he was convicted in the State of Kentucky for wanton endangerment and terroristic threatening?

A. Yes, sir.

Q. Pardon me.
A. Yes, sir.

Q. And did you know he was also convicted in the State of Kentucky for aggravated burglary of the third degree in 1982?

A. Yes, sir.

Q. You knew that didn't you? And you knew he was convicted of aggravated burglary in the third degree in 1983 in the State of Kentucky also, didn't you?

A. I don't have a total recall on all the convictions, sir.

29

Q. In other words the truth of the matter there is [sic] so many and they're so numerous that it's hard for you to recall them?

A, He had an extensive history, yes.

Q. And you also know that as late as 1991 he was convicted of aggravated burglary right over in Adams County, don't you?

A. I knew he had an Adams County conviction.

…

Q. And you also know as a result of all these convictions he's had, he's served a considerable time in different state penal institutions, hasn't he?

A. Yes, sir.

…

ECF No. 8, Attachment 49 thereto, PageID 776; *Id.*, Attachment 50 thereto, PageID 222-26.

This dialogue makes it clear that Ms. Hoop, through counsel, had access to information concerning Mr. Lindsey's long and involved criminal history and Ms. Hoop presented that information to the jury.

Assuming that there was evidence establishing that at the time Donald Hoop was murdered, Mr. Lindsey was the target of an ongoing investigation into a string of robberies in Brown County, that evidence was not favorable to Ms. Hoop nor was not material. First, the jury heard from Detective Coburn about Mr. Lindsey's long and extensive criminal history. That history would give support to the proposition that Mr. Lindsey was, in fact, an appropriate individual for Ms. Hoop to solicit and with whom to conspire. Secondly, although Mr. Lindsey may have been the subject of an investigation, no charges had been brought against him and he had not been convicted of those particular offenses. It is difficult to see how Ms. Hoop would have been able to introduce such evidence at trial.

30

The fact that Ms. Hoop did not have the information that Mr. Lindsey was the subject of an active investigation by the Brown County Sheriff's Office regarding a recent string of burglaries did not deprive her of a fair trial because there is not a reasonable probability that the jury would have reached a different conclusion if that evidence had been introduced at trial. The state court's decision as to this subclaim is not contrary to or an unreasonable application of clearly established federal law and it should be rejected.

In her last argument in support of her Brady claim, Hoop asserts that the cumulative effect of the suppressed evidence compels a conclusion of materiality (Second Amended Petition, ECF No. 148, PageID 4928-30).

In determining the materiality of evidence not produced by the prosecution and therefore not heard by the jury, a habeas court is to consider the cumulative effect of all undisclosed evidence which is material and exculpatory or impeaching. *Abdur'Rahman v. Colson*, 649 F.3d 468, 476-77 (6th Cir. 2011), *cert. denied,* ___ U.S. ___, 133 S.Ct. 91 (2012), citing *Doan v. Carter,* 548 F.3d 449, 460 (6th Cir. 2008), *cert. denied,* 558 U.S. 842, and *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

The Court has addressed in detail each of Ms. Hoop's *Brady* claims.  Some of her claims relate to evidence which was not in fact suppressed (e.g., Carl Lindsey's criminal record).  Other evidence was not in fact exculpatory (e.g., the report of a car speeding in the opposite direction from Trooper Moore).  Considering cumulatively the balance of the evidence not provided, the Court cannot say it was material, taken together.  That is, the ultimate decision of the Twelfth District denying the *Brady* claims is neither contrary to nor an objectively unreasonable application of *Brady* and its progeny.

Ms. Hoop's First Ground for Relief should be dismissed.

**Ground Two:  Failure of the Brown County Sheriff to Preserve the Investigatory File**

In her Second Ground for Relief, Ms. Hoop asserts her constitutional rights were violated when the Brown County Sheriff failed to preserve his investigatory file regarding the Donald Hoop murder.  This claim was presented as the second assignment of error on appeal from denial of the motions for new trial and the Twelfth District decided it as follows:

> {¶ 34} THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S SECOND CLAIM FOR RELIEF.
>
> {¶ 35} In Hoop's second assignment of error, she argues that the trial court erred by not granting her motion for a new trial because the state destroyed evidence.
>
> {¶ 36} In holding that the state's failure to preserve potentially useful evidence does not violate a defendant's due process rights absent a showing that the state acted in bad faith, the Ohio Supreme Court, in *State v. Geeslin,* 116 Ohio St.3d 252, 2007–Ohio–5239, ¶ 9–10, observed that,
>
> The Supreme Court of the United States addressed this issue in *Arizona v. Youngblood* (1988), 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281. In that case, the court stated: "The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady,* makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." In that situation, the court held, "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." A clear distinction is drawn by *Youngblood* between materially exculpatory evidence and potentially useful evidence. If the evidence in question is not materially exculpatory, but only potentially useful, the defendant must show bad faith on the part of the state in order to demonstrate a due process violation.

{¶ 37} Based on the precedent of both the Ohio and United States Supreme Courts, the state has an obligation to disclose evidence favorable to the accused, which is material to his guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194 (1963)."Favorable evidence is material * * * 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles v. Whitley,* 514 U.S. 419, 433–434, 115 S.Ct. 1555 (1995), quoting *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375 (1985). "A 'reasonable probability' of a different result is * * * shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Id.* at 434, quoting *Bagley,* 473 U.S. at 678.

*8 {¶ 38} However, the rule in *Brady* does not apply to evidence that is merely "potentially useful." *Geeslin,* 2007–Ohio–5239 at ¶ 9–10."Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."*Id.* at ¶ 9, quoting *Youngblood,* 488 U.S. at 58.

{¶ 39} Hoop now argues that the investigatory file contained favorable material because it would have contained laboratory reports, reports memorializing communication between officers and witnesses, as well as information regarding the evidence mentioned in Hoop's first assignment of error. However, Hoop's argument is based on mere speculation as to what was in the file. She is unable to delineate what specific information the file held, and is unable to state with any degree of certainty that such evidence, if it existed, was materially exculpatory in nature.

{¶ 40} The police investigation file would offer, at best, potentially useful evidence. Even if the file contained laboratory reports, communication from witnesses, or information regarding the evidence set forth in Hoop's first assignment of error, we cannot say that this file would have produced evidence of Hoop's innocence. As discussed within Hoop's first assignment of error, the state's theory of the case was that she was involved in the planning stages of her husband's murder. The jury considered physical evidence, was presented with the contradictory statements of the state's witnesses, and observed the cross-examination of the police officials who participated in the murder investigation. Given the jury's verdict, it chose to believe that Hoop took part in the planning of the murder, and the information that may have been in the police investigatory file would not have undermined the jury's verdict.

{¶ 41} Even if we were to assume that the evidence may have proved useful in supporting Hoop's defense that she did not participate in the murder, we cannot say that Hoop is able to show any bad faith on behalf of the police investigating the murder. While it is undisputed that the investigatory file was not found, the records keeper for the Brown County Sheriff's Department testified that the records were unable to be found. However, there was no evidence that the state or police destroyed any potentially useful evidence from the file or secreted the file away in any manner.

{¶ 42} Moreover, Hoop was provided with 1,450 pages of law enforcement records, 24 CDs of information, as well as the files from the prosecutor's office. Had the state wished to destroy evidence, we find it incredulous that so much information and evidentiary materials would have remained. Furthermore, these evidentiary materials contained enough information that Hoop was able to present several claims for relief when she moved the court for a new trial.

{¶ 43} As stated by the Ohio Supreme Court, the mere fact that evidence is lost or destroyed by the state does not constitute a *per se* violation of a defendant's due process rights. *Geeslin,* 2007–Ohio–5239. While Hoop argues that the police file would have contained exculpatory evidence, the fact remains that Hoop's argument is based solely on speculation and we cannot say she is entitled to a new trial. There is no indication from the record that the file held any exculpatory evidence, and at best *may* have contained "potentially useful" evidence regarding Hoop's involvement in her husband's murder. However, absent a showing of bad faith on behalf of the state, the fact that the file is missing or has been destroyed has not violated Hoop's due process rights, nor does it entitle her to a new trial. Having found that the state did not act in bad faith in losing or destroying the police file and that Hoop is not entitled to a new trial because the state lost or destroyed the police file, Hoop's second assignment of error is overruled.

*State v. Hoop*, 2012-Ohio-92, ¶¶ 34-43, 2012 WL 777332 (Twelfth Dist. Mar. 12, 2012).

Ms. Hoop's Second Claim for Relief fails for at least two reasons. First, Ms. Hoop has not satisfied the *Youngblood* "bad faith" standard. Ms. Hoop alleges that, "[a]t some unknown point in time the Brown County Sheriff's Department lost its entire investigative file concerning

the death of Whitey Hoop", ECF No. 148, PageID 4931, and, "[t]he investigative file for the death of Donald Whitey Hoop is missing", ECF No. 154, PageID 5092. Ms. Hoop acknowledges that Deputy Sheriff Jennifer Green testified at her May 16, 2008, deposition that in 1997, she had responsibility for keeping the sheriff office's records and files, that she has searched for the file related to the investigation of Whitey Hoop's murder, and that she could not find it. ECF No. 154, PageID 5092; see also, ECF No. 146, Attachment 1 thereto, PageID 4524-44.  However, nowhere does Ms. Hoop claim that the "disappearance" of the Brown County Sheriff's Department investigative file concerning the death of Whitey Hoop was due to the bad faith of the police who investigated the killing of Whitey Hoop. See ECF No. 148, PageID 4930-32; ECF No. 154, PageID 5092-95.

Second, Ms. Hoop's claim that the missing investigative file contained exculpatory evidence is largely based on speculation. For example, Ms. Hoop alleges that "it can be reasonably anticipated that the investigatory files would have contained exculpatory evidence" in addition to the evidence she discussed in her First Ground for Relief and that it "would be reasonable to conclude that the files would contain information concerning the reasons that Norman Fisher and Kenny Swinford were initially considered suspects." ECF No. 154, PageID 5093. However, Ms. Hoop's allegations of "reasonably anticipated" and "reasonable to conclude" do not satisfy the requirement that the exculpatory value of the lost evidence be apparent before the evidence was lost. *Trombetta*, 467 U.S. at 489.

The Twelfth District's decision on this ground for relief is neither contrary to nor an objectively unreasonable application of the clearly established Supreme Court precedent which the Twelfth District both cited and faithfully applied.  The Second Ground for Relief should be dismissed.

**Ground Three:  Failure to Conduct an *In Camera* Interview of Investigator Handorf**

Ms. Hoop has withdrawn her Third Ground for Relief (Traverse, ECF No. 154, PageID 5096.)

**Ground Four:  Failure to Release the Name of the Person who Provided the Murder Weapon to Carl Lindsey**

In her Fourth Ground for Relief, Ms. Hoop claims she was denied the right to present a defense by the refusal of the state courts to release to her the name of the person who Lawrence Handorf, Carl Lindsey's investigator, had learned supplied the murder weapon to Lindsey (Second Amended Petition, ECF no. 148, PageID 4936-39.)

At trial Kathy Kerr testified she saw Hoop give Carl Lindsey a firearm just prior to the murder.  Furthermore at trial the victim's daughter testified the murder weapon was similar in appearance to a firearm owned by her father, supporting an inference that Ms. Hoop had access to the gun because she was married to the victim (Second Amended Petition, ECF No. 148, PageID 4937, 4939).

The claim that Larence Handorf should have been compelled to identify the person who supplied the weapon was raised on direct appeal as the first assignment of error and decided by the Twelfth District as follows:

> Assignment of Error No. 1:
>
> THE TRIAL COURT ERRED TO DEFENDANT'S PREJUDICE IN DENYING HER MOTION FOR PRODUCTION OF EXCULPATORY EVIDENCE, AND FOR A NEW TRIAL

BASED ON THE DENIAL OF ACCESS TO THAT EVIDENCE
AT HER ORIGINAL TRIAL.

Appellant argues that Handorf could not refuse to divulge the name
of a non-party witness by asserting attorney-client privilege.
Appellant also maintains that this information should not be
withheld under the protection afforded to investigative work
product because disclosure of such "work product" should have
been compelled upon the showing of substantial need.

On the initial appeal, we remanded to the trial court to determine
whether appellant offered sufficient proof to warrant an *in camera*
review of the investigator concerning the allegedly privileged
information. We stated that in this review, the trial court should
first determine whether the sought-after witness existed. We
further ordered that if the trial court determined that such a witness
did exist, the trial court should hold an *in camera* hearing and
determine if the information from the investigator was privileged
or work product. The trial court then was to consider whether
appellant's need for the information outweighed the privilege that
protected this information from disclosure if the court found that
the information was in fact privileged or work product.

At the hearing following our remand, the trial court took testimony
from R. Scott Croswell, appellant's trial attorney, and from
Handorf. Croswell testified to the reasons why he thought there
was a witness who could exculpate appellant. Croswell stated that
Handorf never told him that this witness existed. Croswell testified
that he believed that if there were no such witness, Handorf would
have told Croswell, as a professional courtesy, that such a witness
did not exist. Handorf testified that he had made no statement or
gesture to confirm or otherwise indicate to Croswell that Handorf
knew about this exculpatory witness. The trial court, after taking
the testimony of witnesses and hearing the arguments of counsel,
ruled that an *in camera* hearing was not warranted and no further
proceedings were required. Based on its ruling, the trial court
denied appellant's motion for a new trial on the exculpatory
evidence issue.

*3 A ruling on a motion for a new trial rests within the sound
discretion of the trial court and will not be reversed on appeal
absent an abuse of discretion. *State v. Schiebel* (1990), 55 Ohio
St.3d 71, paragraph one of syllabus. An abuse of discretion
connotes more than an error of law or judgment; it implies that the
trial court's action was unreasonable, arbitrary or unconscionable.
*Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219.

> The trial court explicitly found that Handorf made no statement to Croswell to confirm or otherwise indicate the existence of a sought-after witness with exculpatory information. Accordingly, the trial court did not reach the issue of whether any information Handorf may have had was privileged or work product. As a result, we find that the trial court's decision concerning the exculpatory evidence and denying the motion for a new trial was not unreasonable, arbitrary, or unconscionable. The trial court did not abuse its discretion in deciding that there was no factual basis to support a good faith belief that an exculpatory witness existed and finding that an *in camera* review was not necessary. Appellant's first assignment of error is overruled.

*State v. Hoop*, 201 WL 877296 (12th Dist. Aug. 6, 2001).

The Twelfth District's decision on this issue rests on a credibility determination made by the trial court upon its examination of both Mr. Croswell and Mr. Handorf.  There is no federal constitutional violation in relying on such a credibility determination.  The Fourth Ground for Relief is therefore without merit.


**Ground Five:  Ineffective Assistance of Trial Counsel**


In her Fifth Ground for Relief, Ms. Hoop asserts she suffered from ineffective assistance of trial counsel.  This claim was raised as third assignment of error on appeal from denial of the new trial motions and decided by the Twelfth District as follows:

> {¶ 44} Assignment of Error No. 3:
>
> {¶ 45} THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S THIRD CLAIM FOR RELIEF.
>
> {¶ 46} Hoop argues in her third assignment of error that the trial court erred when it denied her motion for a new trial based on ineffective assistance of counsel.

{¶ 47} The Sixth Amendment pronounces an accused's right to effective assistance of counsel. Warning against the temptation to view counsel's actions in hindsight, the United States Supreme Court has stated that judicial scrutiny of an ineffective assistance claim must be "highly deferential * * *. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged actions 'might be considered sound trial strategy.' " *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052 (1984), quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158 (1955).

{¶ 48} Also within *Strickland,* the Supreme Court established a two-part test which requires an appellant to establish that first, "his trial counsel's performance was deficient; and second, that the deficient performance prejudiced the defense to the point of depriving the appellant of a fair trial."*State v. Myers,* 12th Dist. No. CA2005–12–035, 2007–Ohio–915, ¶ 33, citing *Strickland.*

{¶ 49} Regarding the first prong, an appellant must show that his counsel's representation "fell below an objective standard of reasonableness."*Strickland,* 466 U.S. at 688.The second prong requires the appellant to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."*Id.* at 694.Because the appellant must prove both prongs, a reviewing court need not address the deficiency issue if appellant was not sufficiently prejudiced by counsel's performance. *Id.* at 697.

{¶ 50} Hoop argues that her trial counsel was ineffective because he failed to conduct a reasonable pretrial investigation. Hoop asserts that her trial counsel stated that he had retained the services of a private investigator to aid in the investigation, but that the investigator was never retained. Essentially, Hoop argues that had counsel retained the services of the investigator, such investigation would have uncovered the evidence discussed in Hoop's first assignment of error. Hoop states that absent the services of an investigator, her trial counsel did not interview Donald Barnett, the witness who heard someone say "come on, lets go get out of here" [sic] on the night of the murder. Counsel did not inquire into Deputy's Moore's call to dispatch regarding the speeding car on State Route 68, or that officers contacted the hospitals to request information on any suspicious injuries. Hoop also argues that her counsel failed to adequately pursue the theory that Swinford or Kerr were possibly the second assailants, and that Lindsay was

already a suspect in a series of burglaries. Counsel did not interview the detective who testified before the grand jury regarding the crime scene, and did not interview the technicians who performed the forensic testing.

{¶ 51} However, and as already discussed within Hoop's first assignment of error, these issues were not material to Hoop's defense, and we cannot say that the result of her trial would have been different had an investigation uncovered these specific issues or had they been presented to the jury.

{¶ 52} Hoop also asserts that her counsel did not adequately prepare a defense witness whom she believes would have offered favorable evidence to her defense. Hoop claims that had the witness been properly prepared, he would have testified that he saw Lindsey threatening to shoot Donald Hoop with a small firearm prior to the night of the murder. According to the witness' affidavit, "prior to February 10, 1997, [I] saw Carl Lindsey with a small black hand gun and heard him say he was going to take [Donald Hoop] out." However, even if the jury had heard this specific testimony from the witness, the statement does not prove that Hoop was not involved in the crime, or even that she had not provided the gun to Lindsey at some previous time.

{¶ 53} While the statement may have called into question the timing of Hoop giving Lindsay the gun, the statement does not demonstrate that the gun Lindsey had prior to February 10, 1997 was the same gun that killed Donald. In fact, there is nothing in the witness' statement that demonstrates that he saw Lindsay with *the* gun that killed Donald, only *a* gun. Even if Hoop's trial counsel had prepared the witness to make the statements contained in his affidavit, there is no reasonable probability that, but for counsel's failure to prepare the witness, the result of the proceedings would have been different.

{¶ 54} After reviewing the record, we cannot say that the results of Hoop's trial would have been different had the foregoing evidence or information been presented to the jury. Having found that Hoop did not receive ineffective assistance of counsel, her third assignment of error is overruled.

*State v. Hoop*, 2012-Ohio-992, 2012 WL 777332 (12th Dist. Mar. 12, 2012).

The right to counsel guaranteed by the Sixth Amendment is the right to the effective

assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686, quoting *McMahon v. Richardson,* 397 U.S. 759, 771 n.7 (1970). "The Supreme Court set forth the test for ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 ... (1984)". *Eley v. Bagley,* 604 F.3d 958, 968 (2010).

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that the counsel's performance was deficient.  This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland,* 466 U.S. at 687.  In other words, "[t]o establish ineffective assistance, a defendant 'must show both deficient performance and prejudice.' " *Berghuis v. Thompkins,* 560 U.S. 370, 388, (2010), *quoting, Knowles v. Mirzayance,* 556 U.S. 111, 122 (2009).

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential....  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland,* 466 U.S at 689, *quoting, Michel v. State of Louisiana,* 350 U.S. 91, 101 (1955).

As to the second prong, the Supreme Court said:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome.

*Strickland,* 466 U.S. at 694; *see also*, *Darden v. Wainwright,* 477 U.S. 168, 184 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998).

> The standard of review governing Abby's ineffective assistance of counsel claim is "doubly deferential." *See, e.g., Burt v. Titlow,* ___ U.S. ___, 143 S.Ct. 10, 13… (2013). To establish ineffective assistance under *Strickland v. Washington,* 466 U.S. 668, 687-88 … (1984), a habeas petitioner must demonstrate that his legal representation "fell below an objective standard of reasonableness" as indicated by "prevailing professional norms," and that he suffered prejudice as a result. There is a "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, …. AEDPA mandates the application of a second layer of deference; we examine only whether the state court was reasonable in its determination that counsel's performance was adequate. *Burt,* 134 S.Ct., at 18. "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington,* 131 S.Ct. at 785.

*Abby v. Howe*, 742 F.3d 221, 226 (6th Cir. 2014).

The Twelfth District clearly understood that *Strickland v. Washington* provides the governing law on ineffective assistance of trial counsel claims and Ms. Hoop has not shown that its application of Strickland was objectively unreasonable, especially in light of the double deference we must pay to such decisions under *Harrington, supra*.  The Fifth Ground for Relief is therefore without merit.

**Ground Six: Factual Innocence**

In her Sixth Ground for Relief, Ms. Hoop asserts that she is factually innocent of the murder of Donald Hoop (Second Amended Petition, ECF No. 148, PageID 4944-46.) The Warden asserts this claim is not cognizable in federal habeas corpus (Return, ECF No. 150, PageID 4992-93, citing *Herrera v. Collins*, 506 U.S. 390 (1993). Case law in the Sixth Circuit establishes that the Supreme Court of the United States has never recognized a free-standing or substantive actual innocence claim. *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007), *citing Zuern v. Tate*, 336 F.3d 478, 482, n.1 (6th Cir. 2003), and *Staley v. Jones*, 239 F.3d 769, 780, n.12 (6th Cir. 2001).

The Sixth Ground for Relief should be dismissed for failure to state a claim upon which habeas corpus relief can be granted.

**Ground Seven: Cumulative Error**

In her Seventh Ground for Relief, Ms. Hoop asserts that the accumulation of errors in her trial warrant habeas corpus relief. However, this Court has determined that there was no error that rose to the level of a constitutional violation. Therefore, there cannot be any cumulative error. Furthermore, since adoption of the Antiterrorist and Effective Death penalty Act, a claim of cumulative error is not cognizable in federal habeas corpus. *Sheppard v. Bagley,* 657 F.3d 338, 348 (6th Cir. 2011), *cert. denied sub nom., Sheppard v. Robinson,* ___ U.S. ___, 132 S.Ct. 2751 (2012), citing *Moore v. Parker,* 425 F.3d 250, 256, *cert. denied sub nom, Moore*

*v. Simpson,* 549 U.S. 1027 (2006); see also, *Lorraine v. Cole,* 291 F.3d 416 (6th Cir. 2002).

**Conclusion**

Based on the foregoing analysis, it is respectfully recommended that the Second Amended Petition be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

November 4, 2015.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).